**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1483**

OLD DOMINION ELECTRIC COOPERATIVE,

Plaintiff – Appellant,

v.

PJM INTERCONNECTION, LLC,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  M. Hannah Lauck, District Judge. (3:19-cv-00233-MHL)

Argued:  October 28, 2021                    Decided:  January 19, 2022

Before MOTZ, KING, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Motz and Judge Harris joined.

**ARGUED:**  Joseph Michael Rainsbury, MILES & STOCKBRIDGE PC, Richmond, Virginia, for Appellant.  Lucas M. Walker, MOLOLAMKEN, LLP, Washington, D.C., for Appellee.  **ON BRIEF:**  Thomas M. Wolf, MILES & STOCKBRIDGE PC, Richmond, Virginia, for Appellant.  Robert M. Rolfe, Brian A. Wright, HUNTON ANDREWS KURTH LLP, Richmond, Virginia; Jeffrey A. Lamken, Washington, D.C., Jennifer E. Fischell, MOLOLAMKEN LLP, New York, New York, for Appellee.

KING, Circuit Judge:

In this appeal, plaintiff Old Dominion Electric Cooperative challenges the district court's dismissal of its state law claims seeking nearly $15 million in damages from defendant PJM Interconnection, LLC. Following a severe cold weather outbreak in January 2014, Old Dominion unsuccessfully sought to recover certain electricity generation costs from PJM in an administrative proceeding before the Federal Energy Regulatory Commission ("FERC"). Old Dominion subsequently instituted the underlying litigation in Virginia state court, pursuing four putative state law claims against PJM which seek the same relief unsuccessfully claimed before FERC.

PJM timely removed the state court proceedings to the Eastern District of Virginia, pursuant to 28 U.S.C. § 1441(a). PJM maintained therein that Old Dominion's complaint contests electricity transmission rates set forth in PJM's federally filed tariff and that the district court was vested with federal question jurisdiction under 28 U.S.C. § 1331. PJM promptly moved to dismiss the complaint for failure to state a claim, while Old Dominion moved for a remand to state court.

On March 31, 2020, the district court denied Old Dominion's remand motion and dismissed each of its claims with prejudice. *See Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, No. 3:19-cv-00233 (E.D. Va. Mar. 31, 2020), ECF No. 26 (the "Dismissal Opinion"). In so ruling, the court determined that, consistent with our 2004 decision in *Bryan v. BellSouth Communications, Inc.*, 377 F.3d 424 (4th Cir. 2004), Old Dominion's putative state law claims effectively challenge the terms of PJM's federal tariff. As such, and in accord with the principles enunciated by the Supreme Court in *Gunn*

2

*v. Minton*, 568 U.S. 251 (2013), and *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), the court ruled that the claims present a substantial federal question. In granting PJM's motion to dismiss, the court further resolved that the so-called "filed-rate doctrine" barred it from awarding damages on Old Dominion's claims. On appeal, Old Dominion maintains that PJM's tariff stands only as a defense to its putative state law claims and that the district court consequently lacked subject matter jurisdiction over those claims. As explained herein, Old Dominion's contentions are unpersuasive and are rejected. We therefore affirm the judgment of the district court.

I.

A.

Old Dominion is a nonprofit electric utility that serves customers in Virginia, Maryland, and Delaware. It generates and markets wholesale electric power, in part from the operation of three natural-gas-fired power plants in Virginia and Maryland. PJM, on the other hand, is not a utility but is instead a "regional transmission organization," an entity that operates the electrical grid in a defined geographic area and in accord with extensive regulatory oversight by FERC. PJM is charged with supervising the transmission of electricity in its market region, which consists of 13 states and the District of Columbia. In fulfilling that responsibility, PJM controls the transmission facilities owned by its member utilities — including Old Dominion. *See* 18 C.F.R. § 35.34(j), (k).

PJM's relationship with each of its member utilities is governed by FERC's regulatory framework. The Federal Power Act vests FERC with exclusive regulatory authority over "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," directing FERC to ensure that all "rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy" be "just and reasonable." *See* 16 U.S.C. §§ 824(a), 824d(a). Accordingly, FERC requires regional transmission organizations like PJM to file schedules of proposed electricity transmission rates with the agency for its approval. Once authorized by FERC, those rates are set forth in tariffs, which "[c]arry the force of federal law," in the same sense as ordinary federal regulations. *See Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004). Further, under the regulatory rule known as the "filed-rate doctrine," the transmission rates charged by utilities in association with the generation and sale of electric power may not be higher or lower than those set forth in FERC-approved tariffs. *See Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 576 (1981).

PJM's FERC-approved tariffs include (1) its Open Access Transmission Tariff (the "PJM Tariff," or simply "the Tariff") and (2) its Amended and Restated Operating Agreement (the "Operating Agreement"). The PJM Tariff prescribes rules controlling PJM's management of the mid-Atlantic energy market and, as relevant in this appeal, fixes the price at which power generators may offer their energy production to PJM in standard

electricity auctions — specifically at $1000 per megawatt-hour. *See* J.A. 127.[1] The Operating Agreement, to which participating utilities like Old Dominion subscribe, reflects the terms of the Tariff. The Operating Agreement further affords PJM expansive powers to take "measures appropriate to alleviate an Emergency, in order to preserve reliability" in the electric market, principally by calling on its member utilities "to start, shutdown, or change output levels of [their] generation units" at any time. *See Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1228 (D.C. Cir. 2018). As the relevant regulatory tariffs, the PJM Tariff and Operating Agreement together "conclusively and exclusively enumerate the rights and liabilities of the contracting parties." *See Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998) (internal quotation marks omitted). That is, all business that PJM conducts with electric utilities in its extensive market region must conform to the terms of its FERC-approved tariffs.

The standards established and imposed by the PJM Tariff and Operating Agreement became particularly significant during the January 2014 "polar vortex," a weather disturbance that brought uncharacteristically frigid temperatures to much of the eastern United States. *See* J.A. 25. The polar vortex prompted abrupt increases in consumer demand for electricity, which, in turn, required utilities and transmission organizations like Old Dominion and PJM to take swift actions to ensure that reliable supplies of power were available for use in heating homes and businesses. As temperatures plummeted, PJM

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

directed its member utilities to prepare for increases in their electric generation output. With respect to Old Dominion, PJM issued specific instructions for the utility to purchase sufficient quantities of natural gas to begin operating its Virginia and Maryland power plants at full capacity. Old Dominion maintains that — at that time — PJM also represented to Old Dominion's agents that the company would "make [Old Dominion] whole for its fuel and other costs associated with purchasing the natural gas." *Id.* at 26; *see also* Br. of Appellant 5.

When PJM issued its directives to Old Dominion, the price of natural gas had spiked above its pre-polar vortex levels due to the weather-related strains on energy production resources. Once paired with the costs of operating the Virginia and Maryland facilities, the heightened gas purchase price forced Old Dominion's net costs for electricity generation to approximately $1200 per megawatt-hour — well north of the $1000 maximum rate fixed by the PJM Tariff. In compliance with PJM's orders, Old Dominion nevertheless purchased the needed fuel at the inflated price. After it did so, however, PJM repeatedly cancelled its operation requests or scaled them back in duration because of overestimates of consumer demand for power. The weather-driven market conditions compelled Old Dominion to sell generation capacity to PJM at a substantial loss, and Old Dominion ultimately incurred an aggregate sum of $14,925,669.58 in costs that exceeded the rate that it could legally charge PJM under the Tariff. In the disputes that followed, neither party contested that those losses — sustained because Old Dominion's sales exceeded PJM's tariffed rate — were unrecoverable under the express terms of the Tariff.

6

B.

Old Dominion first sought relief from the excess incurred costs by way of a June 2014 administrative proceeding before FERC. *See Old Dominion Elec. Coop.*, 151 FERC ¶ 61,207 (2015). Relying on its facility operation expenses and the excessive costs of natural gas purchased but not burned, the utility petitioned FERC for the full amount of its excess costs and damages — again, $14,925,669.58. Old Dominion did not dispute that its January sales to PJM fell within the scope of the Tariff and Operating Agreement provisions that control the entities' relationship. Indeed, Old Dominion "repeatedly conceded" before FERC that the PJM Tariff "categorically precluded" the compensation it sought. *See Old Dominion*, 892 F.3d at 1231. Old Dominion nevertheless petitioned FERC for a retroactive waiver of the Tariff's rate-cap provisions, relying on equitable considerations and PJM's representations that it would "make [Old Dominion] whole" for the excessive costs it had incurred during the polar vortex emergency. *See* J.A. 26.

PJM intervened in the proceeding and, in consideration of its desire to fairly compensate Old Dominion, actually supported the utility's waiver request. FERC nevertheless denied relief, concluding that the filed-rate doctrine and the corresponding rule against retroactive ratemaking — a rule that prohibits the agency from adjusting tariffed rates retroactively absent limited and inapplicable exceptions — prohibited granting any waiver of the PJM Tariff's established rates. Old Dominion sought a rehearing of FERC's denial order, but FERC also denied that request. *See Old Dominion Elec. Coop.*, 154 FERC ¶ 61,155 (2016). FERC explained that the above-mentioned equitable concerns did not grant it any authority to waive the filed-rate doctrine and that

7

doctrine's bar on compensating Old Dominion above the Tariff's $1000 rate cap. Additionally, the agency determined that no outside contract providing for recovery of the emergency-related losses had been made between the parties, and that, in any event, FERC-approved rates cannot be modified or superseded by way of informal private agreements.

Although appellate relief was sought by Old Dominion in 2018, the D.C. Circuit denied its petition for review of FERC's adverse decisions. In so ruling, the court of appeals observed that the "emphatic rules against retroactively changing filed rates" disarmed Old Dominion's arguments supporting a waiver of the PJM Tariff's rate cap. *See Old Dominion*, 892 F.3d at 1231. The court also approved of FERC's determination that it lacked discretion to waive filed rates "for good cause or for any other equitable considerations." *Id.* at 1230. Although Old Dominion sought review in the Supreme Court of the adverse ruling by the court of appeals, the Court promptly denied its petition for a writ of certiorari. *See Old Dominion Elec. Coop. v. FERC*, 139 S. Ct. 794 (2019).[2]

---

[2] Old Dominion was not alone in its efforts to recover losses incurred during the polar vortex event. Other PJM member utilities were similarly faced with substantial excessive costs associated with PJM's emergency procedures that, under the terms of the PJM Tariff, were not compensable. Duke Energy, for example, sought a waiver of PJM's rate cap just as Old Dominion did. As in this case, FERC denied Duke's waiver request and the D.C. Circuit affirmed FERC's decision. *See Duke Energy Corp.*, 151 FERC ¶ 61,206 (2015); *Duke Energy Corp. v. FERC*, 892 F.3d 416 (D.C. Cir. 2018).

8

C.

On January 5, 2017, Old Dominion filed this civil action against PJM in the Henrico County Circuit Court in Virginia.[3] In alleging a breach of several purported private contracts, the operative Amended Complaint sets forth the same factual contentions at issue in the FERC proceedings, focusing on PJM's "failed assurances" that the company would "make [Old Dominion] whole for its fuel and other costs" incurred in connection with the polar vortex event. *See* J.A. 26. The Amended Complaint alleges four discrete claims against PJM, each purportedly grounded in state law: two claims for breach of contract, one for unjust enrichment, and another for negligent misrepresentation. Those claims are alleged in the alternative, with each asserting that it entitles Old Dominion to damages in the sum of $14,925,669.58 — the precise amount Old Dominion sought in petitioning FERC for a waiver of the PJM Tariff's rate cap. *See id.* at 30-33. The Amended Complaint refers to the applicable Tariff only once, to allege that Old Dominion and PJM "entered into a transaction that was outside of the requirements . . . set forth in any tariff or other regulated PJM policy or process." *Id.* at 29.

PJM removed Old Dominion's state court lawsuit to the Eastern District of Virginia in April 2019. By its Notice of Removal, PJM maintained that, as required by 28 U.S.C. § 1441(a), the litigation could have been initiated in federal court, namely on grounds of

---

[3] Old Dominion's initial 2017 state court complaint in Henrico County was filed after the failure of the utility's administrative pursuits before FERC, but prior to the 2018 resolution of its appeal to the D.C. Circuit. The operative Amended Complaint was filed by Old Dominion in March 2019, shortly after the Supreme Court's denial of certiorari in the FERC litigation.

federal question jurisdiction. More specifically, PJM asserted that Old Dominion's state law tort and contract claims "arise under" federal law, as contemplated by 28 U.S.C. § 1331, because they (1) are completely preempted by federal law or, alternatively, (2) necessarily raise a substantial federal question by challenging the terms of an applicable federally filed tariff. PJM also moved to dismiss the entirety of the Amended Complaint for failure to state a claim, relying on the PJM Tariff and contending that Old Dominion's demands for relief are barred by the filed-rate doctrine. Old Dominion opposed PJM's motion to dismiss and moved for a remand to the Virginia state court, insisting that its claims do not fall within the scope of federal question jurisdiction because their allegations are entirely confined to violations of state law.

By its Dismissal Opinion and Final Order of March 31, 2020, the district court denied Old Dominion's motion to remand and granted PJM's motion to dismiss the Amended Complaint. Addressing the question of subject matter jurisdiction, the Dismissal Opinion first explained that Old Dominion's four claims could "arise under" federal law in either of two ways: under the "complete preemption" doctrine, or otherwise under the "substantial federal question" doctrine. *See* Dismissal Opinion 13. Finding the former to be inapplicable, the court concluded that, by effectively challenging the terms of the FERC-filed PJM Tariff, Old Dominion's claims "necessarily raise" a substantial federal question. *Id.* at 27-28. Because it possessed subject matter jurisdiction over the claims, the court went on to conclude that the filed-rate doctrine proscribed it from awarding relief that would, in effect, alter the Tariff's rate cap as applied to Old Dominion. Accordingly, the court dismissed with prejudice each of the four claims alleged in the Amended Complaint.

10

In its Dismissal Opinion, the district court focused its analysis on our decision in *Bryan v. BellSouth Communications, Inc.*, 377 F.3d 424 (4th Cir. 2004), which concerned the removal to federal court of a putative state law claim in North Carolina that challenged allegedly unfair telephone service rates charged by BellSouth. The rates charged by BellSouth and other telecommunications carriers were controlled by the Federal Communications Commission (the "FCC") through filed tariffs. We concluded in *Bryan* that the plaintiff's claim — which, by requesting damages, effectively sought a refund of some portion of BellSouth's service rate and thereby contested the terms of the carrier's federal tariff — necessarily presented a substantial question of federal law and ran afoul of the filed-rate doctrine. *See id.* at 430-32. We recognized in *Bryan* that, because federal tariffs "are the law, not mere contracts," suits that effectively challenge the substance of such tariffs "arise[] under federal law" and may be heard in federal court. *Id.* at 429-30.

The Dismissal Opinion deemed *Bryan* as controlling here, and further determined that exercising federal jurisdiction was appropriate under the Supreme Court's *Gunn-Grable* framework, which must be employed in assessing whether a claim rooted in state law nonetheless poses a "substantial federal question." *See Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005)). The district court thus ruled that, by demanding the same relief sought before FERC — relief unambiguously barred by the terms of the PJM Tariff — Old Dominion's claims necessarily raise a substantial federal question suitable for adjudication in federal court. Old Dominion has timely noted this appeal from the dismissal of its claims with prejudice, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

11

## II.

We review de novo a district court's determination that it possessed subject matter jurisdiction over a plaintiff's claims. *See Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). PJM removed Old Dominion's state court proceedings to the district court pursuant to 28 U.S.C. § 1441(a), which requires that a state case "be fit for federal adjudication at the time the removal petition is filed." *See Moffitt v. Residential Funding Co.*, 604 F.3d 156, 159 (4th Cir. 2010) (quoting *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 73 (1996)). PJM's Notice of Removal asserted that the district court possessed federal question jurisdiction over Old Dominion's claims alleged in the Amended Complaint under 28 U.S.C. § 1331, which affords the federal courts jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States."

In determining whether a claim "arises under" the laws of the United States, courts abide by the "well-pleaded complaint rule," assessing whether the plaintiff's cause of action — as stated on the face of the complaint — has some basis in federal law. *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 807-08 (1986). The "vast majority" of such claims are those directly created by federal law, and a defense or counterclaim that raises a federal question is not an adequate basis for § 1331 jurisdiction. *See id.* at 808 (citing *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149 (1908)). It follows that, as a general proposition, the plaintiff is the "master of the complaint" and may keep his complaint out of federal court simply by "eschewing claims based on federal law." *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987). Under the corollary "artful pleading" doctrine, however, "a plaintiff may not defeat removal by omitting to plead

12

necessary federal questions in a complaint." *See Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 22 (1983); *see also Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir. 1986) ("[A] plaintiff may not defeat removal by clothing a federal claim in state garb, or, as it is said, by use of 'artful pleading.'").

Claims for relief that are rooted in state law, then, may nevertheless "arise under" federal law and fall within the scope of federal question jurisdiction in one of two narrow instances. First, under the "complete preemption" doctrine, federal jurisdiction is proper under § 1331 "when Congress 'so completely pre-empt[s] a particular area that any civil complaint raising th[e] select group of claims is necessarily federal in character.'" *See Pinney v. Nokia, Inc.*, 402 F.3d 430, 449 (4th Cir. 2005) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987)). Second, federal question jurisdiction may be exercised "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *See Merrell Dow*, 478 U.S. at 808-09 (quoting *Franchise Tax Bd.*, 463 U.S. at 9). The "substantial federal question" doctrine, that is, operates to permit removal of a complaint from state court where "a plaintiff's ability to establish the necessary elements of his state law claims must rise or fall on the resolution of a question of federal law." *See Pinney*, 402 F.3d at 449. In these circumstances, because Old Dominion's claims pose a substantial question of federal law, we need not decide whether the district court was vested with jurisdiction by way of complete preemption.[4]

---

[4] We observe, however, that the complete preemption doctrine is most likely inapplicable in this situation. The Supreme Court has explained that it is "reluctant" to find that federal law provides the exclusive cause of action in an area that is federally
(Continued)

13

Although the substantial federal question doctrine has long been recognized in the federal courts, the Supreme Court brought clarity to what it called an "unruly doctrine" through the *Gunn-Grable* framework.[5]  *See Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005)).  *Gunn-Grable* provides for a four-part test, explaining that

> federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.

*Id.*  Since the Court's decision in *Gunn* in 2013, that four-part test has been the principal means for assessing whether resolution of a state law claim requires consideration of federal law, such that federal question jurisdiction is appropriate.  *See, e.g.*, *Pressl v. Appalachian Power Co.*, 842 F.3d 299, 303 (4th Cir. 2016).

Several years before the Court's creation of the *Gunn-Grable* test, our decision in *Bryan* described the substantial federal question doctrine as follows:

---

regulated.  *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).  Indeed, in our 2005 decision in *Lontz v. Tharp*, we identified only three statutes to which the Court has applied the complete preemption doctrine — specifically, the Labor Management Relations Act, ERISA, and the National Bank Act.  *See* 413 F.3d 435, 441 (4th Cir. 2005).  Recognizing the doctrine's historically sparse application, the Seventh Circuit has ruled that the Federal Power Act — the very statute affording FERC the rate-regulation authority at issue in this case — does not completely preempt associated state law claims.  *See Ne. Rural Elec. Membership Corp. v. Wabash Power Ass'n, Inc.*, 707 F.3d 883, 896 (7th Cir. 2013).

[5] In *Gunn*, the Court expounded on the state of the substantial federal question doctrine by noting that while "outlining the contours" of the rule did not involve "paint[ing] on a blank canvas . . . the canvas looks like one that Jackson Pollock got to first."  *See Gunn v. Minton*, 568 U.S. 251, 258 (2013).  Pollock, an abstract expressionist painter, was noted for his convoluted and chaotic works.

> [W]hen, as here, state law creates the plaintiff's cause of action, the lower federal courts possess jurisdiction to hear "only those cases in which a well-pleaded complaint establishes . . . that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."

*See* 377 F.3d 424, 428-29 (4th Cir. 2004) (quoting *Franchise Tax Bd.*, 463 U.S. at 27-28). We ruled therein that a federally filed and approved regulatory tariff "carries the force of federal law" and that "a claim that seeks to alter the terms of the relationship . . . set forth in a filed tariff therefore presents a federal question." *Id.* at 429. In similar fashion, a claim seeking to have a court fix a special, reasonable tariffed rate unique to the plaintiff "effectively challenges" the relevant filed tariff in contravention of the filed-rate doctrine and likewise raises a substantial federal question. *Id.* at 429-30. In such a situation, the filed-rate doctrine — which strictly directs that "the rate of the carrier duly filed is the only lawful charge," and bars the courts from permitting such inequity among ratepayers — compels a dismissal of the plaintiff's claim. *Id.* (quoting *Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 97 (1915)).

## III.

On appeal, Old Dominion maintains that the district court did not possess federal question jurisdiction over its state law claims against PJM, and that the court's dismissal of those claims was accordingly erroneous. More specifically, Old Dominion contends that the PJM Tariff is merely a defense to its state claims, rather than being integral to the claims' demands for relief. In light of our *Bryan* decision and our application of the *Gunn-Grable* framework, however, we are satisfied that the district court possessed jurisdiction

15

under the substantial federal question doctrine. Consistent with *Bryan*, the Dismissal Opinion correctly determined that Old Dominion's claims effectively challenge the terms of the PJM Tariff, and that, by extension, the filed-rate doctrine obliged the district court to dismiss the putative state claims in the Amended Complaint. We are satisfied that *Bryan* controls the resolution of this dispute because, as in that case, Old Dominion's asserted right to relief necessitates recourse to the Tariff that controls the utility's relationship with PJM, thereby presenting a substantial federal question.

Nor are we persuaded that *Bryan* has somehow been weakened or undermined by subsequent decisions of this Court, or by the Supreme Court's *Gunn-Grable* test. The Fourth Circuit decisions relied on by Old Dominion as having eroded *Bryan*'s rulings are entirely consistent with *Bryan*'s treatment of the substantial federal question doctrine.[6] The *Gunn-Grable* framework, meanwhile, is likewise consistent with *Bryan*'s standard, and our application of *Gunn-Grable* in this case counsels the same outcome as our application of *Bryan*. As such, we must affirm the district court's ruling that it possessed subject matter jurisdiction. Consistent therewith, we also affirm the court's dismissal with prejudice of Old Dominion's Amended Complaint and its four claims.

---

[6] We also observe that, even if Old Dominion had identified Fourth Circuit decisions that conflict with *Bryan*, a panel of this Court cannot circumscribe or undermine an earlier panel decision, pursuant to *McMellon v. United States* and its progeny. *See* 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court."); *see also United States v. Williams*, 808 F.3d 253, 261 (4th Cir. 2015); *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021).

16

A.

1.

The crux of this appeal concerns the applicability of *Bryan* to the facts of this case and whether Old Dominion's claims may fairly be said to necessarily raise a substantial federal question. PJM deems *Bryan* to be dispositive, while Old Dominion considers that decision to be watered down at best, if not impliedly overruled by the Supreme Court. As explained below, we agree with the district court that *Bryan* remains "binding case law," is factually comparable to this case, and compels the decision we reach today. *See* Dismissal Opinion 21.

The *Bryan* decision resolved a question concerning the removal to federal court of a North Carolina state law challenge to service rates charged by BellSouth, a major telecommunications firm later acquired by AT&T. Seeking to represent a class of BellSouth customers, plaintiff Bryan alleged that the carrier's "Federal Universal Service Charge," a fee assessed to recoup BellSouth's required payments to a federal telecommunications fund, was an excessive charge that contravened North Carolina's unfair trade practices law. *See* 377 F.3d 424, 426 (4th Cir. 2004). BellSouth removed the state court litigation to the Middle District of North Carolina, contending that Bryan's complaint necessarily raised federal legal questions. BellSouth explained that the fee contested by Bryan was definitively established alongside other service rates in its "Schedule of Charges," a tariff filed with and approved by the FCC. *Id.*

Following BellSouth's removal to federal court, plaintiff Bryan filed an amended complaint alleging three state law claims: (1) a claim alleging that BellSouth had engaged

17

in unfair trade practices by failing to disclose how it calculated the service fee and that the fee was in excess of what was paid into the federal fund; (2) an unjust enrichment claim, maintaining that the fee was excessive and unlawful; and (3) a claim alleging a breach of the covenant of good faith and fair dealing that stemmed from BellSouth's charging an excessive fee. The amended complaint generally sought damages in excess of $10,000 for each member of the putative class. Bryan moved for a remand to state court, while BellSouth moved to dismiss the amended complaint pursuant to the filed-rate doctrine. In disposing of those motions, the district court first determined that removal was proper because the plaintiff directly alleged that the amount of the federally tariffed fee was excessive. The court then dismissed Bryan's second and third claims, but remanded her first claim alleging unfair trade practices, ruling that the unfair trade practices claim did not present a federal question. BellSouth appealed the order remanding and denying dismissal of that claim, maintaining that it also challenged the FCC tariff and therefore arose under federal law.

On appeal, we vacated and remanded. Our decision concluded that the unfair trade practices claim "effectively challenge[d]" BellSouth's filed rate, that it therefore presented a federal question, and that the district court erred in remanding the claim and should have dismissed it under the filed-rate doctrine. *See Bryan*, 377 F.3d at 430. Relying on the Supreme Court's 1983 decision in *Franchise Tax Board v. Construction Laborers Vacation Trust*, we first explained that federal question jurisdiction will exist for a state law claim only where the plaintiff's complaint establishes that his right to relief "necessarily depends on resolution of a substantial question of federal law." *Id.* at 429 (quoting 463 U.S. 1, 28

18

(1983)). Recognizing that filed tariffs carry the force of federal law, we then resolved that any claim seeking to alter the terms of the relationship between parties to a federally approved tariff necessarily presents a federal question. By the same token, we recognized that a claim for relief that would require a court to determine a reasonable tariffed rate specific to a plaintiff "effectively challenges" the terms of the tariff, again posing a substantial federal question. *Id.* at 430-31. That is so, we explained, because the filed-rate doctrine bars a court from awarding damages that would have the effect of altering the tariffed rate ordinarily paid by the plaintiff. And doing so would disturb the doctrine's dual aims of preventing discrimination among ratepayers and safeguarding the ratemaking authority of federal agencies.

Ultimately, we determined in our *Bryan* decision that, although the unfair trade practices claim underlying the appeal did not directly challenge BellSouth's tariffed rate, it had the legal effect of requesting a court to fix a reasonable rate particular to the plaintiff, thereby presenting a substantial federal question. Because that claim alleged that BellSouth's rate was deceptive and sought damages in that regard, we found that "the only plausible reading" of the claim was that plaintiff Bryan effectively sought a refund of some portion of BellSouth's tariffed fee. *See Bryan*, 377 F.3d at 432. As a result, awarding the requested damages would have violated the filed-rate doctrine. We therefore concluded that the district court possessed federal question jurisdiction over the North Carolina unfair trade practices claim and should have dismissed it.

2.

a.

Old Dominion's putative state law claims are of course facially different from the North Carolina claim at issue in *Bryan*, principally alleging the existence of an outside contract instead of unfair trade practices. That distinction aside, however, the utility's four claims in its Amended Complaint fit squarely within the map of our analysis in *Bryan*. In fact, although Old Dominion's claims present an "effective challenge" to the PJM Tariff, the claims pursued by Old Dominion set up an even more direct challenge to that tariff than was the situation in *Bryan*.[7]

The *Bryan* decision controls in this appeal because, as was the situation therein, the type of relief sought here is incontrovertibly barred by the governing regulatory tariff.[8] That is, determining that the four putative state claims afford Old Dominion a right to relief in the first instance requires consideration and construction of the federal tariff that controls

---

[7] Old Dominion misreads the *Bryan* decision in part, observing that the amended complaint in that case "directly challenged a component of a FCC-filed tariff" and asserting that *Bryan* is inapposite for that reason. *See* Br. of Appellant 28, 30. But the claims presenting direct challenges to BellSouth's service fee — that BellSouth unjustly enriched itself and breached the covenant of good faith and fair dealing by charging an excessive fee — were not on appeal in *Bryan*. *See* 377 F.3d at 427 & n.4. Rather, plaintiff Bryan's unfair trade practices claim, which only "effectively challenge[d]" BellSouth's FCC tariff, was the claim we assessed in *Bryan* and is that which is relevant to this appeal. *Id.* at 430.

[8] We also observe that *Bryan*'s consideration of a telecommunications tariff approved by the FCC does not render that case distinguishable from this litigation, which involves a FERC-approved tariff. Public utility regulation, which extends to firms supplying electricity, gas, and the like, is "essentially the same form of regulation" as that relating to common carriers providing transportation or communications services. *See Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir. 1998).

the entirety of Old Dominion's relationship with PJM. In *Bryan*, the refund sought by the plaintiff was barred and forbidden by BellSouth's FCC tariff. Here, the reimbursement for electricity generation costs sought by Old Dominion's Amended Complaint is similarly precluded by the PJM tariff. In both situations, the plaintiff seeks a special tariffed rate unique to it, which federal law plainly disallows. Because no court can award the damages that Old Dominion seeks without finding some way around the terms of the PJM Tariff, "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *See Bryan*, 377 F.3d at 430 (quoting *Franchise Tax Bd.*, 463 U.S. at 28).[9]

More specifically, a straightforward assessment of Old Dominion's various claims reveals that they seek to "alter the terms of the relationship" set forth in the federally filed PJM Tariff. *See Bryan*, 377 F.3d at 429. As we explained in *Bryan*, such an objective necessarily presents a federal question. Under both the Tariff and Operating Agreement,

[9] Old Dominion also claims on appeal that the district court ran afoul of the well-pleaded complaint rule by considering matters outside of the Amended Complaint — including the PJM Tariff, the Operating Agreement, and the FERC and D.C. Circuit proceedings — in its jurisdictional analysis. As the court explained in its Dismissal Opinion, however, it properly took notice of those matters in scrutinizing the nature of Old Dominion's removed claims. *See* Dismissal Opinion 2-3 nn. 3-4, 11 n.9 (explaining that a court is not confined to pleadings in ruling on a motion to remand). It is not the case that "the grounds for removal must appear on the face of the complaint, unaided by reference to other pleadings or the notice of removal." *See* 14C Charles A. Wright et al., *Federal Practice & Procedure* § 3734 (rev. 4th ed. 2021). Rather, "in the context of possible federal-question jurisdiction," it is appropriate for the court to conduct an examination of the record as a whole "to reveal the true nature of the plaintiff's claim." *See id.*; *accord Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 22 (1983) ("[I]t is an independent corollary of the well-pleaded complaint rule that a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint."). The Dismissal Opinion astutely observed that both parties made repeated references to and relied on the PJM Tariff and the earlier administrative proceedings and appeals.

Old Dominion's relationship with PJM is structured such that when the utility sells its power generation capacity to PJM, it may not charge more than $1000 per megawatt-hour. The parties do not dispute here — nor did they in the proceedings before FERC and the D.C. Circuit — that the losses incurred from Old Dominion's generating electricity at a cost of roughly $1200 per megawatt-hour are not compensable under the PJM Tariff. In petitioning FERC for a waiver of the Tariff, Old Dominion alleged that it sustained $14,925,669.58 in losses — precisely the sum demanded in each of its four state law claims against PJM. There can be no good faith contention that the relief that Old Dominion now seeks is different in character than it was during the utility's administrative proceedings. The damages sought are for the costs incurred during the 2014 polar vortex — that is, costs "in connection with the transmission or sale of electric energy subject to the jurisdiction of [FERC]." *See* 16 U.S.C. § 824d(a). And as the district court observed, "the governing federal statute leaves scant room for [Old Dominion] to maneuver." *See* Dismissal Opinion 19. Simply put, federal law provides that Old Dominion cannot have what it asks for, and the utility is not entitled to "artfully plead" away the fact that its claims seek to alter the terms of its tariffed relationship with PJM, thereby presenting a federal question under *Bryan*.

By extension, awarding the relief that Old Dominion now seeks would require "entering a judgment that would serve to alter the rate paid by [the] plaintiff," as the damages demanded exceed the sum authorized by law under the PJM Tariff's rate cap. *See Bryan*, 377 F.3d at 429 (quoting *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1316 (11th Cir. 2004)). That is, Old Dominion requests a court to stand in the shoes of FERC

22

and set a reasonable tariffed rate specifically for purposes of compensating it for its polar vortex-related losses. We made plain in our *Bryan* decision that such a maneuver promotes discrimination among ratepayers and impinges upon the ratemaking jurisdiction of federal agencies, in contravention of the filed-rate doctrine's simple mandate that "the rate of the carrier duly filed is the only lawful charge." *Id.* (quoting *Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 97 (1915)). *Bryan* explained that any claim "hav[ing] the effect of imposing different rates upon different customers" invokes the filed-rate doctrine, poses a substantial question of federal law under that doctrine, and must be dismissed pursuant thereto. *Id.* at 430. Again, *Bryan* compels our conclusion that the district court possessed federal question jurisdiction and properly dismissed Old Dominion's putative state law claims as posing an "effective challenge" to the PJM Tariff.[10]

b.

Under *Bryan*, it is evident that the substance of each of Old Dominion's four claims necessarily invokes a substantial federal question.[11] The PJM Tariff, then, cannot be

---

[10] We expressed in *Bryan* that our rulings should not be taken to imply that the filed-rate doctrine is "conterminous with the scope of federal question jurisdiction." *See* 377 F.3d at 430 n.8. Rather, we clarified that in certain instances — as in this appeal — "the inquiries merge," *id.*, and as the district court characterized it here, "there is no daylight between the question of jurisdiction and dismissal in regard to claims that challenge federal tariffs," *see* Dismissal Opinion 28. Indeed, as the *Bryan* dissenter conceded, "claims requiring the court to second-guess the reasonableness of [an agency's rate] determination are properly said to require the court to resolve a substantial federal question." *See* 377 F.3d at 435 (Luttig, J., dissenting).

[11] Old Dominion correctly reminds us that the question of whether a state claim "necessarily" poses a federal question typically calls for consideration of whether the federal issue constitutes a "necessary element" of the claim. *See Pinney v. Nokia, Inc.*, 402 (Continued)

23

construed simply as a defense to the claims' allegations when the Tariff is vital to the relief that they seek. Old Dominion maintains that, if anything, the Tariff only extinguishes its right to relief. We find that characterization to be premature, however, as determining that the utility enjoys such a right in the first place requires consulting the terms of the Tariff.

Old Dominion roots its effort to cast the PJM Tariff as a preemptive affirmative defense in our decision in *Burrell v. Bayer Corp.*, 918 F.3d 372 (4th Cir. 2019). Those comparative efforts, however, are unavailing. The *Burrell* decision did not concern any dispute over a regulatory tariff, nor did it involve *Bryan*'s controlling principle that an effective challenge to a filed tariff poses a substantial federal question. *Burrell* involved a removal to federal court of state law negligence and product liability claims relating to a defective birth-control device. The district court ruled that it possessed federal question jurisdiction because the plaintiffs' complaint was "replete with" explicit allegations that the defendant had violated Food and Drug Administration ("FDA") regulations, thus "necessarily raising" substantial questions of federal law. *Id.* at 379. Having concluded

F.3d 430, 449 (4th Cir. 2005). The parties disputed before the district court whether Virginia or North Carolina law governs Old Dominion's claims. Technical construction of the elements of those claims is unnecessary, however, because *Bryan* directs that the nature of the claims and the damages they seek inherently poses a federal question. Nevertheless, it is apparent that weighing the merits of Old Dominion's tort and contract claims — under either Virginia or North Carolina law — would require resort to federal law. Put succinctly, the allegations set forth in each claim relate solely to the relationship between the parties that is exclusively controlled by the PJM Tariff. *See Cahnmann*, 133 F.3d at 488 ("Any rights that the plaintiff has to complain about a breach of contract are rights granted to her by the original tariff . . . .").

24

that it retained jurisdiction over the plaintiffs' claims, the court granted the defendant's motion to dismiss on preemption grounds.

We explained on appeal, however, that the statutory provision granting the FDA regulatory authority over the birth-control device contained a preemption provision barring state remedies for violations of common-law duties unless the alleged wrongs "parallel[ed] federal regulatory requirements." *See Burrell*, 918 F.3d at 377 (internal quotation marks omitted). Accordingly, the plaintiffs were obliged to plead the regulatory violations in order to fend off a preemption defense. We thus concluded that the only "federal questions" involved in *Burrell* operated as defenses to the plaintiffs' claims and that, because jurisdiction does not lie under 28 U.S.C. § 1331 simply because a federal defense is "anticipated in the plaintiff's complaint," the district court erred in failing to remand. *Id.* at 381.

Although *Burrell*'s resolution turned on an application of the substantial federal question doctrine, that decision bears little factual resemblance to the dispute now before us. The *Burrell* plaintiffs' right to the relief they sought could be established without any resort to federal law; it was only the case that, after such right was established, federal law posed the possibility of cutting off the plaintiffs' ability to recover. That is not the situation here. In this case, there is not merely a "lurking question of federal law in the form of the affirmative defense of preemption." *See Burrell*, 918 F.3d at 382 (internal quotation marks omitted). Instead, the federal law embodied in the PJM Tariff is part and parcel of each of Old Dominion's claims. The utility simply cannot prove that PJM owes it nearly $15 million "in connection with the transmission or sale of electric energy," *see* 16 U.S.C.

25

§ 824d(a), without "seek[ing] to alter the terms of the relationship . . . set forth in [PJM's] filed tariff," *see Bryan*, 377 F.3d at 429. In sum, Old Dominion's contention that the Tariff is merely a defense to its claims is without merit.

c.

In these circumstances, we are persuaded that the *Bryan* decision permits only one resolution of this appeal. The nature of Old Dominion's claims places them squarely within the scope of the PJM Tariff, such that the utility's right to relief is inextricably intertwined with federal law. Critically, that fact does not change by virtue of Old Dominion having artfully clothed its inherently federal claims "in state garb." *See Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 758 (2d Cir. 1986). Just as in *Bryan*, Old Dominion seeks with its putative state claims to alter the terms of its tariffed relationship with PJM, to be awarded a tariffed rate different from that enforced against other electric utilities, and ultimately to undermine FERC's statutory authority to ensure that all "rates and charges made . . . in connection with the transmission or sale of electric energy" be "just and reasonable." *See* 16 U.S.C. § 824d(a). Accordingly, each of Old Dominion's claims by necessity poses a substantial federal question, and the district court possessed subject matter jurisdiction.

B.

1.

Old Dominion alternatively asserts that, irrespective of how it may bear on this appeal, the *Bryan* decision "has not withstood the test of time." *See* Br. of Appellant 28. According to Old Dominion, *Bryan* lacks "continuing precedential force" in view of this

26

Court's subsequent decisions and the Supreme Court's formulation of the *Gunn-Grable* standard. *See* Reply Br. of Appellant 29. With respect to our precedent, Old Dominion specifically maintains that we have weakened or eliminated *Bryan*'s "effective challenge" standard in explaining federal preemption defenses in *Burrell* and *Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005), a predecessor to *Burrell* that similarly found that federal regulatory defenses to state law tort claims did not provide a district court federal question jurisdiction.

Old Dominion's arguments in this regard are unconvincing, as *Burrell* and *Pinney* are not inconsistent with *Bryan*. Those decisions bore no relation to *Bryan*'s assessment of veiled challenges to regulatory tariffs and did not question or undermine *Bryan*'s interpretation of the substantial federal question doctrine. Moreover, the PJM Tariff does not operate as a defense of the sort considered in *Burrell* and *Pinney*. And multiple decisions of our sister circuits are in accord with *Bryan*'s determination that challenges to federal tariffs present questions of federal law. *See, e.g.*, *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488-89 (7th Cir. 1998); *Ne. Rural Elec. Membership Corp. v. Wabash Power Ass'n, Inc.*, 707 F.3d 883, 891-92, 893 n.5 (7th Cir. 2013); *Hill v. BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1315-17 (11th Cir. 2004); *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998).

Moving beyond *Burrell* and *Pinney*, Old Dominion argues that the Supreme Court's decisions in *Gunn v. Minton*, 568 U.S. 251 (2013), and *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), impliedly overruled *Bryan* by seeking to "refine" the "unruly" substantial federal question doctrine as it existed

27

at the time of *Bryan*'s decision. *See* Reply Br. of Appellant 29 (quoting *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014)). We agree with the district court, however, that *Bryan*'s explicit standard "closely tracks the *Gunn-Grable* framework," and that the latter did no harm to the former. *See* Dismissal Opinion 15 n.11.

*Gunn-Grable* principally inquires whether a "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial," reflecting the well-established standard of the substantial federal question doctrine. *See Gunn*, 568 U.S. at 258 (quoting *Grable*, 545 U.S. at 314). *Bryan*'s own characterization of that doctrine was drawn from the Supreme Court's decision in *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1 (1983), which itself informed the Court's development of the *Gunn-Grable* test. *See Grable*, 545 U.S. at 312-14 (citing *Franchise Tax Board* in tracing the history of the "longstanding . . . variety of federal 'arising under' jurisdiction [that] will lie over state-law claims that implicate significant federal issues"). *Gunn-Grable* then counsels a further normative consideration, namely whether the state claim at hand is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *See Gunn*, 568 U.S. at 258. That concern is also revealed in *Bryan*, however, as reflected in the rationale behind its "effective challenge" standard — that is, any lawsuit seeking to enforce or invalidate a federally filed tariff may appropriately be heard in the federal courts. In sum, *Bryan* and *Gunn-Grable* share a common foundation and spell out harmonious legal principles. As such, *Bryan* remains good law in our circuit.

## 2.

Although the district court grounded its jurisdictional determination in *Bryan*'s standard, it appropriately conducted an independent assessment of the *Gunn-Grable* framework. And we perceive no error in the court's explicit conclusion that the same result obtains when the Supreme Court's standard is applied to the facts here. The *Gunn-Grable* test provides that there is federal question jurisdiction over a state law claim where the claim presents a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court "without disrupting Congress's intended division of labor between state and federal courts." *See Gunn*, 568 U.S. at 258. Each of those four factors is readily established in this appeal.

As explained at length above, Old Dominion's putative state claims "necessarily raise" a federal issue by seeking relief made unavailable by a federally filed regulatory tariff. The utility's Amended Complaint explains that the requested damages of $14,925,669.58 reflect costs incurred during Old Dominion's operations during the polar vortex in January 2014. Those costs are not compensable under the PJM Tariff's rate cap. By suing PJM for the expenses anyway, Old Dominion effectively challenges the enforceability of PJM's federal tariff and seeks to amend its terms.

The federal issue at hand is, of course, also "actually disputed" — the parties disagree whether the PJM Tariff precludes Old Dominion's ability to recover. With regard to whether the issue is adequately "substantial," the Supreme Court in *Gunn* explained that that inquiry looks to "the importance of the issue to the federal system as a whole" and "the broader significance of the . . . question for the Federal Government." *See* 568 U.S. at 260.

29

Here, Old Dominion seeks to have a state court circumvent FERC's exclusive authority to regulate electric utilities and the interstate electricity transmission market, and we are satisfied that a maneuver of that nature poses an issue of "substantial" significance to the federal government.

Lastly, Old Dominion's claims may appropriately be resolved in federal court for much the same reason: they seek to obtain an excuse from strict compliance with federal regulatory rules. Such an endeavor is most appropriately pursued in the federal administrative setting, as previously pursued here. PJM's removal of Old Dominion's claims to federal court did not "disrupt[] Congress's intended division of labor between state and federal courts" in any way — if anything, the removal could best be said to have righted that intended division. *See Gunn*, 568 U.S. at 258. Accordingly, *Gunn-Grable* is not only compatible with our decision in *Bryan*, but likewise directs that the district court possessed subject matter jurisdiction over Old Dominion's claims.

C.

In sum, *Bryan* and *Gunn-Grable* make it clear that Old Dominion's claims necessarily present a substantial question of federal law. In these circumstances, Old Dominion's claims make no bones about seeking relief precluded by the PJM Tariff, asking a state court to fix a reasonable tariffed rate applicable only to the utility's 2014 losses, and effectively challenging the terms and enforceability of the Tariff's rate cap. Given those efforts, the district court aptly recognized that the substantial federal question doctrine and the filed-rate doctrine work in tandem to render Old Dominion's claims nonviable. We decline Old Dominion's invitation to turn a blind eye to that reality, and instead resolve

30

that the district court was properly vested with federal question jurisdiction and correctly dismissed Old Dominion's claims.

## IV.

Pursuant to the foregoing, the judgment of the district court denying remand and dismissing Old Dominion's claims with prejudice is affirmed.

*AFFIRMED*